## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
## SOUTH BEND DIVISION

| | | |
|---|---|---|
| DARLENE KAY MEADE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 3:12-CV-245 |
| | ) | |
| CAROLYN W. COLVIN[1], | ) | |
| ACTING COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This matter is before the Court for review of the Commissioner of Social Security's decision denying Disability Insurance Benefits to Plaintiff, Darlene Kay Meade.  For the reasons set forth below, the Commissioner of Social Security's final decision is **REVERSED** and this case is **REMANDED** for proceedings consistent with this opinion pursuant to sentence four of 42 U.S.C. section 405(g).

BACKGROUND

On July 1 2010, plaintiff Darlene K. Meade ("Meade" or "claimant") filed an application for Social Security Disability Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. section 401 *et seq.*  Meade alleged that her disability began

---

[1]  On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security.  Pursuant to Federal Rule of Civil Procedure 25, Carolyn W. Colvin is automatically substituted as the Defendant in this suit.

on July 7, 2009, due to arthritis, fibromyalgia, depression, and anxiety. The Social Security Administration denied her initial application and also denied her claim on reconsideration. On November 30, 2011, Meade appeared, represented by counsel, at an administration hearing before Administrative Law Judge ("ALJ") Henry Kramzyk. Testimony was provided by Meade and Leonard M. Fisher, a vocational expert ("VE"). On December 13, 2011, ALJ Kramzyk issued a decision denying Meade's claims, finding her not disabled because she does not have a listing-level impairment or combination of impairments and she retains the functional capacity to perform her past relevant work and a significant number of other jobs despite her functional limitations.

Meade requested that the Appeals Council review the ALJ's decision, but the request was denied. Accordingly, the ALJ's decision became the Commissioner's final decision. *See* 20 C.F.R. § 422.210(a). Meade has initiated the instant action for judicial review of the Commissioner's final decision pursuant to 42 U.S.C. section 405(g).


DISCUSSION

Facts

Meade, who was born on December 7, 1956, has a high school diploma and attended about two years of college classes that were focused on accounting and bookkeeping, but she did not earn a

college degree.  (Tr. 37.)  Her past relevant work includes bookkeeping, accounting, and payroll.  (Tr. 37-40.)  However, she has not worked since July 7, 2009, when she lost her job due to attendance problems and making too many mistakes.  (Tr. 38.)

Medical Evidence

In December of 1998, Meade saw rheumatologist Dr. Disa Sacks for a thorough work up.  (Tr. 219.)  Meade reported having depression for the last six to seven years, difficulty sleeping, and pain.  (Tr. 220.)  Dr. Sacks found tender points in Meade's upper trapezius muscles and marked tenderness over the SI joint and greater trochanteric area that caused her to "jump off the table." (*Id.*)  Dr. Sacks opined that Meade's symptoms corresponded "perfectly" to fibromyalgia, after finding trigger points and ruling out other possible diseases.  (Tr. 219.)  Meade was advised by Dr. Sacks to quit smoking and begin a fitness program.  (*Id.*) She was also prescribed Elavil to help with her sleep issues. (*Id.*)

During a follow up visit in May of 1999, Dr. Sacks reported that Meade was "still having some symptomatology but [was] much improved."  (Tr. 221.)  Dr. Sacks noted that Meade was "not having the severe achiness that she was" yet there were times when she still hurt.  Meade was working full time, going to school, and singing in a band, yet Dr. Sacks advised her of the importance of

exercising in spite of her time limitations because it "works" for fibromyalgia patients. (*Id.*)

In October of 1999, Meade visited Dr. Sacks again. (Tr. 222.) Dr. Sacks noted that Meade had fibromyalgia and was taking Elavil, Restoril, and Prozac. (*Id.*) Dr. Sacks indicated that Meade had "not had an increase in the amount of pain" but was unhappy in her marriage, sleeping to avoid her husband, and not exercising. (*Id.*) Dr. Sacks renewed Meade's medications. (*Id.*)

In October of 2000, an MRI showed mild degenerative changes in Meade's lower back, which left the reviewing physician with an impression of mild generalized lumbar spondylosis. (Tr. 218.) There are no medical records available from October of 2000 to April of 2007.

In April of 2007, Meade's family physician, Dr. Armando Martinez,[2] requested that Meade receive an x-ray from the Neuro Imaging Institutes. (Tr. 241.) This x-ray showed mild degenerative changes of the mid thoracic spine. (*Id.*) At a follow up visit in May of 2007, Dr. Martinez diagnosed Meade with depression and degenerative joint disease of the spine. (Tr. 248.) She was prescribed Effexor and Lipitor. (*Id.*) In June of 2007, Dr. Martinez added Lortab to Meade's medications. (*Id.*) Meade continued to receive treatment from Dr. Martinez regularly throughout 2007, 2008, and 2009, but many of his notes are

---

[2] Both parties note that Dr. Martinez was a poor record keeper whose notes are largely illegible. After review of the record, the Court agrees.

illegible.  (See generally Tr. 229-308.)  On October 20, 2008, it is clear that Meade was prescribed Lyrica by Dr. Martinez.  (Tr. 304.)  At her July 22, 2009, appointment, Dr. Martinez noted that Meade was "doing well" and that she had started taking Effexor. (Tr. 299.)  On August 10, 2009, Dr. Martinez placed Meade on Vicoprofen and Ativan.  (*Id.*)  On November 5, 2009, Dr. Martinez reported that Meade had requested Chantix (for smoking cessation) and pain medication.  (Tr. 297.)

In December of 2009, a CT scan of Meade's cervical spine showed degenerative disc disease with spondylitic changes at C5-C6, a thoracic CT scan showed a lesion of the thyroid gland that left an impression of "probably thyroid adenoma," and a CT scan of Meade's lumbar spine was normal.  (Tr. 223-225.)

At a follow up appointment on January 6, 2010, Dr. Martinez made note of Meade's possible depression.  (Tr. 296.)  In May of that same year, Dr. Martinez, who had been treating Meade since 1995, listed Meade's past medical history of rheumatoid arthritis, bowel irregularities, bronchitis, chest pain, chronic rashes, depression, and anxiety, among others.  (Tr. 292-93.)  Dr. Martinez also noted problems of bone spurs on her cervical spine, lumbar joint pain, polyarthralgias, polyarthropathy, possible hepatitis B, and fibromyalgia.  (Tr. 293.)  Meade's medications were listed as Vicoprofen, Ativan, Ambien, and Pristiq.  (*Id.*)

In July of 2010, a state agency reviewing psychologist, Dr.

William Shipley, reviewed Meade's records and concluded that her claimed mental impairments of depression and anxiety were present but not severe. (Tr. 309, 312, 314.) Dr. Shipley further concluded that Meade had mild restrictions of activities of daily living, mild difficulties in maintaining social function, and mild difficulties in maintaining concentration, persistence, or pace. (Tr. 319.) He did not find any episodes of decompensation of extended duration. (*Id*.) Dr. Shipley did note, however, that coexisting nonmental impairments existed that required referral to another medical specialty. (Tr. 309.)

After moving to Indiana to live with her sister, Meade began treating with Dr. Cynthia Pascual. (Tr. 357.) At her first visit on July 29, 2010, Meade told Dr. Pascual that she had lost her job, gotten divorced, and lost her medical insurance; she then described her history of arthritis, fibromyalgia, depression, and anxiety. (*Id*.) She complained of fatigue, weakness, malaise, weight loss, sleeping issues, racing/skipping heart beats, fatigue, palpitations, loss of appetite, joint swelling, back pain, stiffness, muscle weakness, arthritis, and loss of strength. (Tr. 359.) Meade also described problems with rashes, difficulty concentrating, poor balance and coordination, tremors, anxiety, mental problems, depression, and nervousness. (Tr. 360.)

As far as medications were concerned, Dr. Pascual noted that Meade had been on Cymbalta in the past for her fibromyalgia and

depression but that it had become too expensive for her to afford. (Tr. 357.) Meade also advised Dr. Pascual that she had been on Lyrica in the past but that it made her dizzy so she had to stop taking it. (*Id.*) Dr. Pascual noted that Meade was taking Pristiq for her depression, which seemed to be helping, and Vicoprofen for her arthritis. (*Id.*) Dr. Pascual was worried about Meade's dependency on Ativan, and she informed Meade that she needed to see a psychiatrist to properly manage and prescribe medication for her psychological issues once she was able to obtain health insurance. (Tr. 357, 362.)

During a physical exam, Dr. Pascual found multiple trigger points and noted that Meade was "positive for fibromyalgia trigger [points]." (Tr. 361.) She also found that Meade had a full range of motion of all joints. (*Id.*) At the conclusion of this initial examination, Dr. Pascual came away with impressions of fibromyalgia, generalized arthritis, and depression. (Tr. 361-62.) Dr. Pascual placed Meade on Vicoprofen, Cymbalta, Ambien, and Ativan, and she considered both placing her on Lyrica for chronic pain control and referring her to a pain management specialist once insurance was available to Meade. (*Id.*)

At Meade's next appointment with Dr. Pascual in August of 2010, Meade reported that the Cymbalta had been helping with her fibromyalgia and depression but not her arthritic pain. (Tr. 364.) Meade brought her prior lab results with her to this visit, which

Dr. Pascual reviewed and noted a positive finding of rheumatoid arthritis.[3] (Tr. 364.) During the physical examination portion of the visit, Dr. Pascual found no edema in her extremities and a full range of motion of all joints. (Tr. 365.) Dr. Pascual determined that Meade's generalized arthritis remained unchanged, while her fibromyalgia and depression were improved. (Tr. 365-66.) She was prescribed Vicodin and a higher dose of Cymbalta, and she was instructed to continue taking Ativan and Ambien. (Tr. 366.)

In September of 2010, consulting physician, Dr. Wa'el Bakdash, examined Meade and reported impressions of fibromyalgia, insomnia, depression, anxiety, arthargia/pain in several joints with no restriction of joint movement, and nicotine addiction. (Tr. 325.) Dr. Bakdash opined that Meade was "able to grasp, lift, carry, manipulate objects in both hands and perform repeated movements with both feet." (*Id.*) He further found that she was "able to bend over without any restriction and squat normally . . . sit, stand and walk normally." (*Id.*)

On October 5, 2010, state agency reviewing physician, Dr. J. Sands, concluded that any impairment Meade had was not severe because Meade had "normal gait and station, [could] get on/off [the] exam table without difficulty, [was] able to stand on heels and toes, [her] spine [was] not tender, [and her] joints [were] not swollen." (Tr. 327.)

---

[3] Meade's RA was 14.3, while a normal finding is 13.9; in 2006, however, she had a normal SED rate and a negative ANA. (Tr. 364.)

Meade then saw Dr. Pascual for a follow-up visit on October 21, 2010. (Tr. 368.) Dr. Pascual found that while Cymbalta had initially seemed to help Meade's fibromyalgia, its effectiveness had leveled off and Meade had resorted to taking three Vicodin per day for pain and that Ambien was no longer helping her sleep. (Tr. 369.) She specifically found that Meade's fibromyalgia had deteriorated, and she prescribed Flexeril which would be switched to Amrix if the pain improved. (Tr. 371.)

With regard to Meade's depression, Dr. Pascual referred her to a behavioral health specialist "for disability purposes," to undergo a psychiatric examination, and to deal with her medication issues; Dr. Pascual also discussed the treatment options with Meade and suggested a trial of antidepressants. (*Id.*) Meade was advised to follow up in two weeks and to call immediately if she had worsening symptoms or suicidal ideation. (*Id.*)

On November 22, 2010, state agency reviewing psychologist, Dr. Joseph A. Pressner, affirmed Dr. Shipley's July 2010 assessment of Meade's records. (Tr. 344.) Similarly, on December 3, 2010, state agency reviewing physician, Dr. J.V. Corcoran, affirmed Dr. Sands' October 2010 assessment of Meade's records. (Tr. 345.)

On December 9, 2010, pursuant to Dr. Pascual's referral, Dr. John Haskin examined Meade and diagnosed her with major depression, obsessive-compulsive disorder, and panic disorder with agoraphobia. (Tr. 346, 349). He arrived at this conclusion after noting that

Meade had suffered anxiety and depression for several years, had recently sustained several losses related to her job and home, and had moved in with her sister because she was having "difficulty with functioning" and had to be reminded to take a bath or wash her hair. (Tr. 346, 348.) He noted that while she was "fairly anxious and at times teared up" during the examination, she denied suicidal and homicidal ideations, was alert, oriented, and cooperative, had logical and coherent speech with goal directed thought processes, had intact memory, good concentration, insight and judgment, and possessed average intelligence. (Tr. 349.) Dr. Haskin gave Meade a Global Assessment of Functioning ("GAF") Score of 41 and 45 at different points of his initial report.[4] (Tr. 346, 349.) Dr. Haskin increased Meade's dosage of Cymbalta, gave her a prescription for Ativan, and encouraged her to try singing at an open mike event as a form of therapy to "be able to use that creative aspect of her being."[5] (Tr. 349.)

In February of 2011, Dr. Haskin reported that Meade was "doing much better" and gave her a GAF score of 50.[6] (Tr. 401-02.) Dr. Haskin's most recent report in May of 2011 stated that Meade was

_____

[4] GAF is a scoring system for measuring an individual's overall functional capacity. A GAF of 41 or 45 would include serious symptoms of suicidal ideation, severe obsessional rituals, frequent shoplifting, or any serious impairment in social, occupational, or school functioning.

[5] Dr. Haskin noted that Meade previously sang with a band but had to quit after her son was born and she went back to college, became an accountant, and started dealing with fibromyalgia and anxiety issues. (Tr. 349.)

[6] A GAF score of 50 remains the same as far as symptoms are concerned.

"doing OK" and he gave her a GAF score of 55.[7] (Tr. 398.)

In January of 2011, Meade again visited Dr. Pascual who found her fibromyalgia and arthritis unchanged. (Tr. 378-80.) Dr. Pascual authored a letter to Meade's counsel stating that her condition had deteriorated over the last year because she could not afford insurance to pay for the best medication. (Tr. 351.) Dr. Pascual also stated that she "believe[s] that Darlene can not return to the workforce in the long term." (Tr. 351.)

Meade's Hearing Testimony

At the administrative hearing held on November 30, 2011, Meade stated that she was not married and lived alone in apartment on the second floor of her apartment building. (Tr. 35-36.) She graduated from high school and took about two years of college classes that were focused on accounting and bookkeeping. (Tr. 37.) Meade testified that she has not worked since July 7, 2009, the same month that she filed for disability. (Tr. 38.) She stated, however, that her disability began before her termination. (Id.) Meade stated that she was fired because her work was not adequate, she made too many mistakes, and her attendance "wasn't very good." (Id.)

After being fired, Meade applied for unemployment benefits

_____

[7] A GAF score of 55 includes moderate symptoms of flat affect and circumstantial speech, occasional panic attacks, or moderate difficulty in social, occupational, or school functioning.

and, as of the hearing, was still receiving them; Meade did note, however, that those benefits were "running out." (Tr. 38.) When asked by the ALJ whether she had been actively seeking work since she began receiving the unemployment benefits, Meade responded that she had. (Tr. 38-39.)

Meade testified that she "deals with mental health" conditions and is seeing a psychiatrist. (Tr. 48.) She said she has fibromyalgia that was confirmed by a rheumatologist and includes anxiety, panic attacks, depression and insomnia. (Tr. 48-49.) She reported having spurs all the way down her spine and that her muscles all have nerve damage. (Tr. 48.) She also stated that she has bone spurs in her feet, along with general fatigue, poor memory and poor concentration. (Tr. 49.) She described her pain as "when it's at it's fullest, it's always there, but with the medication it calms it, it feels like my back's on fire, and I'm being stabbed back there." (Tr. 50.) Meade further added that the pain occurs in her "[n]eck and shoulders, several places on my back, right above my knees, my hips really bad, the end of my spine, my arms, my legs, I get headaches." (Tr. 50.) She stated that she can lift or carry ten pounds and can walk a block before she has to stop. (Tr. 52.) She believes she can stand for fifteen minutes and that sitting hurts, but she could sit for about thirty minutes. (Tr. 52-53.) She stated that she can do laundry, vacuum, and dust once in a while. (Tr. 53-54.) She stated that she cooks very little

and has to force herself to eat and does not often do dishes. (Tr. 54.) When asked whether she can take care of her personal needs such as bathing and dressing without assistance, Meade responded yes but stated that it could sometimes be over a month before she would force herself to bathe again or wash her hair. (Tr. 55.) She stated that she hates to shop but will do it when necessary. (*Id.*) Meade acknowledged that she takes care of her cat and that she is able to drive most of the time. (Tr. 56-57.)

### Vocational Expert's Hearing Testimony

At the hearing, the ALJ asked the VE the following hypothetical question:

> Q: Assume a hypothetical claimant of the same age, education, and work experience as the claimant who has the ability to lift, carry, push, pull up to 50 pounds occasionally and 20 pounds frequently. Sit for a total of up to six hours a day. Stand and/or walk for a total of up to six hours a day. This individual could never climb ladders, ropes, or scaffolds. Do you have an opinion whether she could perform any of the occupations in her past relevant work?
>
> A: Yes.
>
> Q: And?
>
> A: She couldn't perform her occupations as accountant, bookkeeper as she performed them, but she could perform them as they're generally performed in the national economy.

(Tr. 68.) The ALJ then asked if there is other work in the economy that Meade could perform. (Tr. 69.) The VE answered yes, and said

Meade could be an addresser, charge account clerk, hand mounter, office helper, cashier, inspector, and school crossing guard. (Tr. 69-70.)

The ALJ posed a second hypothetical question to the VE that assumed Meade's background but was limited to a reduced range of light work, including being able to "lift, carry, push, pull 20 pounds occasionally and 10 pounds frequently." (Tr. 70.) The hypothetical individual could also sit and stand and/or walk for a total of up to six hours a day. (Tr. 70.) The VE answered that those changes would not prevent Meade from performing the aforementioned jobs, or her past relevant work, at the light level. (Tr. 70-71.)

In the third hypothetical question the ALJ instructed the VE to assume the same limitations as hypothetical question two:

> except that the hypothetical individual would be able to sustain concentration and attention for two-hour periods at a time and for eight hours in the work day on short, simple, repetitive instructions, could use judgment in making work decisions related to short, simple, repetitive instructions. And would require an occupation with set routine and procedures, and a few changes during the work day.

(Tr. 71.) The VE responded by stating Meade could not perform her past relevant work but that she could perform the light jobs he

provided in the SVP:[8] 2 category (office helper, cashier, inspector, and school crossing guard). (Tr. 69-72.)

Meade's attorney then asked the VE to assume an individual with the same age, education, and prior work experience as the claimant, and limited to lifting no more than 10 pounds, unable to concentrate for more than 30 minutes at a time, stand for no more than 30 minutes at a time, and would be off task 20 percent of the day. (Tr. 72.) The VE responded that the individual would not be able to perform her past relevant employment and would not be able to perform any other jobs, "[n]ot with those limitations and restrictions." (Tr. 72.)


Review of the Commissioner's Decision

This Court has authority to review the Commissioner's decision to deny social security benefits. 42 U.S.C. § 405(g). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." *Id.* Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a decision." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In determining whether substantial evidence exists, the Court shall examine the record in its entirety, but shall not substitute its own opinion

---

[8] The DOT defines SPV as "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." *Dictionary of Occupational Titles*, Appendix C, page 1009 (4th Ed., Rev. 1991).

for the ALJ's by reconsidering the facts or re-weighing evidence. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). With that in mind, however, this Court reviews the ALJ's findings of law de novo and if the ALJ makes an error of law, the Court may reverse without regard to the volume of evidence in support of the factual findings. *White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999).

As a threshold matter, for a claimant to be eligible for DIB benefits under the Social Security Act, the claimant must establish that he is disabled. To qualify as being disabled, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A). To determine whether a claimant has satisfied this statutory definition, the ALJ performs a five step evaluation:

Step 1: Is the claimant performing substantial gainful activity: If yes, the claim is disallowed; if no, the inquiry proceeds to Step 2.

Step 2: Is the claimant's impairment or combination of impairments "severe" and expected to last at least twelve months? If not, the claim is disallowed; if yes, the inquiry proceeds to Step 3.

Step 3: Does the claimant have an impairment or combination of impairments that meets or equals the severity of an impairment in the SSA's Listing of Impairments, as described in 20 C.F.R. § 404, Subpt. P, App. 1? If yes, then claimant is automatically disabled; if

not, then the inquiry proceeds to Step 4.

Step 4: Is the claimant able to perform his past relevant work? If yes, the claim is denied; if no, the inquiry proceeds to Step 5, where the burden of proof shifts to the Commissioner.

Step 5: Is the claimant able to perform any other work within his residual functional capacity in the national economy: If yes, the claim is denied; if no, the claimant is disabled.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) and 416.920(a)(4)(i)-(v); *see also Herron v. Shalala*, 19 F.3d 329, 333 n. 8 (7th Cir. 1994).

In this case, the ALJ found that Meade suffers from the following severe impairments: fibromyalgia and degenerative changes of the cervical, thoracic and lumbar spine. (Tr. 14.) The ALJ specifically found that Meade's reported irritable bowel syndrome, arthritis, depression, and anxiety did not qualify as severe impairments and resulted in only minimal functional limitations. (Tr. 14-16.)

The ALJ further found that Meade does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525 and 404.1526). (Tr. 17.) The ALJ then determined that Meade has the residual functional capacity ("RFC") to lift and/or carry, and push and/or pull up to 20 pounds occasionally and 10 pounds frequently; stand and/or walk up to 6 hours in an 8 hour day; and sit up to 6 hours in an 8 hour day; all without climbing ladders, ropes or scaffolds. (Tr. 18.) Based

17

upon this RFC assessment, the ALJ found that Meade is capable of performing her past relevant work as a bookkeeper and accountant as they are generally performed in the national economy. (Tr. 22.) Meade believes that the ALJ committed several errors requiring reversal.


Credibility Determination

Although not given its own section, Meade makes several arguments related to the ALJ's credibility determination throughout her brief. Because the ALJ is best positioned to judge a claimant's truthfulness, this Court will overturn an ALJ's credibility determination only if it is patently wrong. *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004). However, when a claimant produces medical evidence of an underlying impairment, the ALJ may not ignore subjective complaints solely because they are unsupported by objective evidence. *Schmidt v. Barnhart*, 395 F.3d 737, 745-47 (7th Cir. 2005). Instead, the ALJ must make a credibility determination supported by record evidence and be sufficiently specific to make clear to the claimant and to any subsequent reviewers the weight given to the claimant's statements *and the reasons for that weight*. *Lopez v. Barnhart*, 336 F.3d 535, 539-40 (7th Cir. 2003)(emphasis added).

In evaluating the credibility of statements supporting a Social Security Application, the Seventh Circuit Court of Appeals

has noted that an ALJ must comply with the requirements of Social Security Ruling 96-7p. *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). This ruling requires that ALJs articulate "specific reasons" behind credibility evaluations; the ALJ cannot merely state that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." SSR 96-7p. Furthermore, the ALJ must consider specific factors when assessing the credibility of an individual's statement including:

1.  The individual's daily activities;

2.  The location, duration, frequency and intensity of the individual's pain or other symptoms;

3.  Factors that precipitate and aggravate the symptoms;

4.  The type, dosage, effectiveness, and side effect of any medications the individual takes or has taken to alleviate pain or other symptoms;

5.  Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6.  Any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and

7.  Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p; *see also Golembiewski v. Barnhart*, 322 F.3d 912, 915-16 (7th Cir. 2003).

In her opening argument, Meade points out that, when finding

her not credible, the ALJ relied on "boilerplate" language that has been criticized by the Court of Appeals for the Seventh Circuit. *See Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012); *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012). In this case, the ALJ stated the following regarding Meade's credibility:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not fully credible to the extent they are inconsistent with the above residual functional capacity assessment.

(Tr. 21.) In *Bjornson*, the Seventh Circuit noted:

> One problem with the boilerplate is that the assessment of the claimant's "residual functional capacity" (the bureaucratic term for ability to work) comes later in the administrative law judge's opinion, not "above" – above is just the foreshadowed conclusion of that later assessment. A deeper problem is that the assessment of a claimant's ability to work will often . . . depend heavily on the credibility of her statements concerning the "intensity, persistence and limiting effects" of her symptoms, but the passage implies that ability to work is determined first and is then used to determine the claimant's credibility. That gets things backwards.

*Id.* at 645. Yet, as noted by the Court in *Adams v. Astrue*,

> While this sort of boilerplate is inadequate, by itself, to support a credibility finding, its use, does not make a credibility determination invalid. Not supporting a credibility determination with explanation and evidence from the record does.

*Adams v. Astrue*, 880 F.Supp.2d 895, 906 (N.D. Ill. 2012) (emphasis in original) (citations omitted). In *Adams*, the ALJ's decision did not use the boilerplate language in a mechanical fashion, and the ALJ offered further explanation to support his conclusion that plaintiff's claimed limitations were not supported by the record as a whole. Accordingly, the court determined that reversal was not warranted.

Here, the ALJ's opinion at least touches on the factors as set forth in SSR 96-7p. He lists a few of Meade's daily activities, he considered her testimony regarding the location, duration, frequency and intensity of pain, he points out that Meade testified that her pain is made worse by trying to do "anything," he describes the treatment she received and the medications she takes, and he refers to Meade's testimony regarding her perceived functional limitations due to pain. (Tr. 20.) However, there is very little (if any) explanation of what it is about these considerations that caused the ALJ to believe Meade was less than fully credible.

For example, when discussing Meade's activities of daily living, the ALJ simply points out that Meade testified she lives alone with her cat, is capable of performing "basic household chores," and can independently care for her personal needs; he also states that she has a license and is able to drive. (Tr. 20.) The ALJ does not further describe these activities or expand upon what

it is about them that makes Meade's credibility suspect.  The
Seventh Circuit has made it clear that "an ALJ may not rely on
minimal daily activities as substantial evidence that the claimant
does not suffer disabling pain." *Clifford v. Apfel*, 227 F.3d 863,
872 (7th Cir. 2000).  Furthermore, although he classifies Meade's
testimony as that which shows she can independently care for her
personal needs, he does not acknowledge that Meade testified that
"sometimes it'll be a month before I'll bathe again or wash my hair
or whatever and get in the tub.  I've – until I can't stand to be
around myself or whatever."  (Tr. 55.)  Neither does the ALJ
acknowledge Meade's testimony that she cooks very little, does few
dishes, and only occasionally goes shopping when necessary.  (Tr.
54-55.)  The Seventh Circuit has consistently warned that an ALJ
cannot "disregard a claimant's limitations in performing household
activities." *Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009);
see also *Craft*, 539 F.3d at 680.  Without further explanation from
the ALJ, the disconnect is difficult for this reviewing Court to
reconcile; the factors were addressed by the ALJ in only a
mechanical fashion.

The ALJ does point out that Meade was fired from her job in
2009 and has been collecting unemployment benefits since that time
while reporting to the Social Security Administration that she is
unable to work.  (Tr. 19-20.)  The ALJ takes issue with this,
stating:

But, by collecting unemployment benefits, the claimant affirmed having looked for work, each week, and that if work was found, she would be ready, willing and able to accept it. Basically, the claimant's unemployment claim is tantamount to saying 'I am able to work' while her disability claim is stating 'I am not able to work.' Both statements are made under the penalty of perjury. These conflicting statements were evaluated when the undersigned assessed the claimant's credibility.

(Tr. 20.) However, the Seventh Circuit has cautioned against using a "claimant's decision to apply for unemployment benefits and represent to state authorities and prospective employers that he is able and willing to work" as the main reason to disregard a claimant's subjective complaints of disability. *Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005); see also *Wilder v. Apfel*, 153 F.3d 799, 801 (7th Cir. 1998) (holding that "employment is not proof positive of ability to work.") The ALJ did not question Meade in any detail regarding her receipt of benefits, despite evidence in the record of great financial hardship.

The ALJ also points out that the record does not contain any records from Dr. Sacks, the physician who first diagnosed Meade with fibromyalgia, or any other rheumatologist since October 1999. (Tr. 18.) Additionally, the ALJ goes on to state that, while Meade testified that she continues to have severe pain in her back due to spurs, the degenerative changes to her spine have not been addressed by an orthopedist. (Tr. 19.) The ALJ also notes that Dr. Pascual's treatment recommendations were "conservative."

(*Id.*)  However, where there is a lack of treatment, the ALJ must also consider the reason for the lack of treatment.  *See Brown v. Barnhart*, 298 F.Supp.2d 773, 797 (7th Cir. 2004).  In *Brown* the Seventh Circuit Court of Appeals noted that:

> The adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment.  The adjudicator may need to recontact the individual or question the individual at the administrative proceeding in order to determine whether there are good reasons the individual does not seek medical treatment or does not pursue treatment in a consistent manner.

*Id.*  Here, the ALJ did not attempt to consider any reasons for a lack of specialized treatment.  The record suggests that financial difficulties may have played a part in Meade's lack of recent treatment, yet the ALJ makes no reference to the indications in the record that financial problems were at least part of the reason for a lack of treatment.  It is impossible for this Court to know if considering this reason would have caused the ALJ to reach a different decision on credibility, and if so, whether that would have ultimately affected his decision in this case.

The ALJ states that the objective medical evidence was persuasive in determining that Meade's allegations were not as severe as alleged.  (Tr. 18.)  In doing so, he first points out

that Meade lost her job in July of 2009 because of her disability, yet the progress notes from Dr. Martinez, Meade's treating physician, indicate she was "doing well" and that there were no documented limitations from fibromyalgia. (Tr. 19.) The ALJ does not acknowledge, however, that Dr. Martinez' notes are largely illegible and that he continued to place Meade on additional medications such as Vicoprofen and Ativan following that July appointment. Without additional analysis by the ALJ, it is difficult for the Court to determine whether one note of "doing well" in a physician's file can support a finding that Meade's claims were not credible. Similarly, the ALJ points out that in late 2010 and twice in 2011, Dr. Pascual commented that Cymbalta was "helping with the fibromyalgia," yet he does not acknowledge that Dr. Pascual also found, for example, that while Cymbalta had initially seemed to help Meade's fibromyalgia, its effectiveness had leveled off and Meade had resorted to taking additional Vicodin per day for pain and that Ambien was no longer helping her sleep. (Tr. 369.) While an ALJ need not discuss every piece of evidence in the record, *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009), he cannot ignore evidence that conflicts with his conclusion. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 354 (7th Cir. 2005). Finally, and perhaps more troubling, are the ALJ's repeated references to the fact that Meade had full range of motion in all joints and that her joints were not swollen. (Tr. 19.) The

ALJ points this out several times in context with the severity of Meade's fibromyalgia, both when discussing Dr. Pascual's records and also when referring to Dr. Bakdash's consultative examination. (*Id.*) However, "[s]ince swelling of the joints is not a symptom of fibromyalgia, its absence is no more indicative that the patient's fibromyalgia is not disabling than the absence of headache is an indication that a patient's prostate cancer is not advanced." *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996); see also *Kurth v. Astrue*, 568 F.Supp.2d 1020, 1030 (W.D.Wis. 2008) (citing *Sarchet* and noting that "the reliance on 'the lack of any evidence of objectively discernible symptoms, such as swelling of the joints,' reflects a 'pervasive misunderstanding of the disease.'")

The overarching problem is that this Court, in reviewing the opinion, cannot discern the reason (other than the paragraph regarding receipt of unemployment benefits) the ALJ believed Meade's testimony was less than fully credible. The opinion lacks the logical bridge that the ALJ is required to build. Here, the ALJ did not make the necessary connections between the facts and his credibility determination. *See Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009) (where an ALJ failed to analyze the factors set forth in SSR 96-7p, the ALJ did not build a logical bridge between the evidence and his conclusion that the claimant's testimony was not credible). Because the ALJ failed to build a logical bridge between the evidence and his determination that the

26

claimant's testimony was not credible, remand is required.

Weight Given to Dr. Pascual's Opinion

Meade argues that the ALJ improperly dismissed the opinion of her treating physician, Dr. Pascual. A treating physician's medical opinion must be given controlling weight if it is "well supported" and not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(c); *see Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011). An ALJ must offer "good reasons" for discounting the opinion of a treating physician. *Martinez v. Astrue*, 630 F.3d 693, 698 (7th Cir. 2011); *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010). Furthermore, SSR 96-2p requires that the ALJ's "decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p.

If the treating physician's opinion is not well supported or is inconsistent with other substantial evidence, the ALJ must apply the following factors to determine the proper weight to give the opinion:

> (1) the length of the treatment relationship and frequency of examination;
>
> (2) the nature and extent of the treatment

relationship;

(3) how much supporting evidence is provided;

(4) the consistency between the opinion and the record as a whole;

(5) whether the treating physician is a specialist;

(6) any other factors brought to the attention of the Commissioner.

20 C.F.R. §§ 404.1527(c) and 416.927(a)-(d); see *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009); *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). It is reversible error for an ALJ to discount the medical opinion of a treating physician without applying this legal standard and for further failing to support the decision with substantial evidence. *Moss*, 555 F.3d at 561.

In a letter to Meade's attorney, Dr. Pascual opined that Meade's conditions of fibromyalgia, arthritis, and depression had deteriorated once she lost her health insurance and could not afford better treatment options. (Tr. 382.) Dr. Pascual indicated that Meade was unable to focus on a job or sustain a sitting job without lifting more than ten pounds of weight on a repetitive basis for eight hours per day, five days a week. (*Id.*) Dr. Pascual noted that Meade had tried Lyrica in the past but that it had made her dizzy, that she was currently on a higher dose of Cymbalta, and that her medications were not controlling her symptoms; as such, Dr. Pascual lissted Meade's prognosis as poor and found it unlikely that she could return to the workforce

longterm. (*Id.*) The ALJ gave Dr. Pasqual's opinion little weight because he found the assessment to be inconsistent with Dr. Pasqual's own progress notes as well as the overall objective medical evidence. (Tr. 21.) He further questioned Dr. Pasqual's motives. (*Id.*)

With regard to the inconsistency of Dr. Pascual's records, the ALJ again pointed to Dr. Pascual's conservative treatment recommendations, her progress notes indicating that medication was helping with Meade's fibromyalgia, and the fact that Dr. Pascual noted that Meade had a full range of motion in all joints. (Tr. 21.) As analyzed more fully in the credibility section above, there are several problems with the ALJ's characterization of the record. First, he did not consider the reasons for Dr. Pascual's conservative treatment, namely that Meade was unable to afford such treatment. *See Brown v. Barnhart*, 298 F.Supp.2d 773, 797 (7th Cir. 2004). Second, while the Government argues Dr. Pascual's records were inconsistent with her opinion because they did not contain any restrictions, because they noted that Meade's fibromyalgia was being improved by medication, and because Dr. Pascual had indicated a full range of motion in Meade's joints, the ALJ did not adequately explain why these progress notes in and of themselves are inconsistent with Dr. Pascual's opinion when viewed in light of the record as a whole. For example, the ALJ failed to acknowledge that Dr. Pascual's progress notes indicate that Cymbalta had

initially seemed to help Meade's fibromyalgia, but its effectiveness had leveled off and Meade had resorted to taking additional pain medication. (Tr. 369.) Also, while the ALJ pointed to Dr. Pascual's progress notes regarding a full range of motion in Meade's joints, he did not adequately explain why these notes were inconsistent with the other documented symptoms of fibromyalgia in the record of trigger points, racing/skipping heartbeats, fatigue, palpitations, loss of strength, difficulty with concentration, depression, and nervousness. Again, an ALJ need not discuss every piece of evidence in the record, *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009), but he cannot ignore evidence that conflicts with his conclusion. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 354 (7th Cir. 2005); see also *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996) ("[Fibromyalgia's] cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia. The principal symptoms are "pain all over," fatigue, disturbed sleep, stiffness, and – the only symptom that discriminates between it and other diseases of a rheumatic character – multiple tender spots . . . that when pressed firmly cause the patient to flinch.") Finally, the Court is troubled by the reference to the ALJ's claim that Dr, Pascual's motives were questionable and that "it appears the doctor is

attempting to assist the claimant with obtaining medical benefits."
(Tr. 21.)  While Dr. Pascual's notes do indicate that she was
referring Meade to a psychiatric evaluation for disability
purposes, they also describe Meade's history of depression,
anxiety, and note Dr. Pascual's her concern that Meade was
dependent on Ativan and needed to be referred to a psychiatrist
from her first appointment.  Although the Government argues that it
was reasonable for the ALJ to question whether Dr. Pascual was
being influenced by sympathy for her patient, it is not proper to
do so when failing to acknowledge other relevant evidence in the
record.  An assumption cannot be a substitute for evidence.
*Barnett v. Barnhart*, 381 F.3d 664, 671 (7th Cir. 2004).

The ALJ's opinion states that SSR 96-2p was considered, but it
is not clear to the Court that the checklist of factors was
adequately considered to determine the appropriate weight to give
to Dr. Meade's opinions.  *Moss*, 555 F.3d at 561; *see also Bauer*,
532 F.3d at 608 (stating that when the treating physician's opinion
is not given controlling weight "the checklist comes into play");
*Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010) (citations
omitted) (criticizing the ALJ's decision which "said nothing
regarding this required checklist of factors.").  For example, the
ALJ's opinion does not demonstrate that he considered the frequency
of examination by Dr. Pascual, the nature and extent of the
treatment, or the additional supporting evidence that was provided

by Dr. Meade. 20 C.F.R. § 416.927(c). The ALJ failed to give "good reasons" for discounting the treating doctor's medical opinion, and failed to demonstrate that he considered all of the required checklist of factors.

As with the analysis regarding the ALJ's credibility determination, the opinion lacks the logical bridge that the ALJ is required to build. Furthermore, "[a]n administrative agency's decision cannot be upheld when the reasoning process employed by the decision maker exhibits deep logical flaws . . . even if those flaws might be dissipated by a fuller and more exact engagement with the facts." *Carradine v. Barnhart*, 360 F.3d 751, 756 (7th Cir. 2004) (citations omitted). This case must be remanded so the treating physician's opinions may be properly addressed.

## Remand is Necessary

A remand is necessary because the ALJ's findings with regard to Meade's credibility and treating physician Dr. Pascual's opinions were not clearly articulated and not sufficiently substantiated with evidence in the record. Because remand is required on these bases, this Court need not address several additional arguments raised by Meade.

## CONCLUSION

For the reasons set forth above, the Commissioner of Social

Security's final decision is **REVERSED** and this case is **REMANDED** for proceedings consistent with this opinion pursuant to sentence four of 42 U.S.C. section 405(g).


**DATED: September 30, 2013**          **/s/ RUDY LOZANO, Judge**
                                       **United States District Court**

33